**UNITED STATES of America**

v.

**AMERICAN FUTURE SYSTEMS, INC., et al.**

**Civ. A. No. 78–1517.**

United States District Court, E.D. Pennsylvania.

Dec. 22, 1982.

As Modified upon Determination of Motion for Reconsideration Aug. 10, 1983.

Gary Tilles, Rachel Shao, Robert S. Forster, Asst. U.S. Attys., Philadelphia, Pa., Diane Dorfman, Teresa Milton, Housing & Credit Sec., Civ. Rights Div., Washington, D.C., for the U.S.

Thomas P. Preston, Alison Lazerwitz, Duane, Morris & Heckscher, Henry Reath, Philadelphia, Pa., for defendants.

### MEMORANDUM

GILES, District Judge.

### INTRODUCTION

In this action, the United States of America, through the Office of the Attorney General, sues defendants alleging that they are creditors within the meaning of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691–1691f [1] and that certain of their business practices violate the ECOA with respect to the prohibited criteria of race, sex, marital status, and year in college. The United States seeks permanent injunctive relief. Defendants admit discrimination based upon certain classifications but assert that this is expressly permitted and encouraged under the ECOA through "special purpose credit programs." *See* Regulation B, 12 C.F.R. § 202 *et seq.*[2]

**1.** Section 1691 of the ECOA provides in pertinent part:

(a) It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—

(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);

(2) because all or part of the applicant's income derives from any public assistance program; or

(3) because the applicant has in good faith exercised any right under this chapter.

\* \* \* \* \* \*

(c) It is not a violation of this section for a creditor to refuse to extend credit offered pursuant to—

(1) any credit assistance program expressly authorized by law for an economically disadvantaged class of persons;

(2) any credit assistance program administered by a nonprofit organization for its members or an economically disadvantaged class of persons; or

(3) any special purpose credit program offered by a profit-making organization to meet special social needs which meets standards prescribed in regulations by the Board;

if such refusal is required by or made pursuant to such program.

**2.** Section 202.8 of Regulation B provides:

(a) Standards for programs. Subject to the provisions of subsection (b), the Act and this Part are not violated if a creditor refuses to extend credit to an applicant solely because the applicant does not qualify under the special requirements that define eligibility for the following types of special purpose credit programs:

\* \* \* \* \* \*

(3) any special purpose credit program offered by a for-profit organization or in which such an organization participates to meet special social needs, provided that:

(i) the program is established and administered pursuant to a written plan that (A) identifies the class or classes of persons that the program is designed to benefit and (B)

I conclude that defendants' actions and programs are clear violations of the ECOA and injunctive relief is warranted. The following constitutes the court's findings of fact and conclusions of law pursuant to Fed.R. Civ.P. 52(a).

### FINDINGS OF FACT

1. American Future Systems, Inc. (hereinafter "AFS") is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal office located at 715 Lancaster Avenue, Bryn Mawr, PA. AFS was incorporated on March 28, 1973.

2. AFS is engaged in the business of selling china, cookware, crystal and tableware and of extending credit to persons who purchase AFS' wares.

3. For each year since its incorporation AFS cash sales have constituted less than 5% of the corporation's sales; the remaining sales are made on credit.

4. AFS is a creditor subject to the provisions of the ECOA.

5. AFS does business in the Eastern District of Pennsylvania.

6. Edward M. Satell is the President, chief executive officer, and principal shareholder of AFS and has held those positions since the incorporation of AFS in 1973.

7. Between 1959 and the incorporation of AFS in 1973, Edward M. Satell was the President of American Foresight Company, a company similar in nature to AFS that was established by Mr. Satell in 1959.

8. Edward Satell resides in the Eastern District of Pennsylvania.

9. Edward Satell is a creditor subject to the provisions of the Equal Credit Opportunity Act, 15 U.S.C. § 1691–1691f.

10. James Brown has been the Vice-President of AFS since its incorporation.

11. Marty Zeises has held the title of either Regional Manager or Regional Vice-President since the incorporation of AFS; both positions have involved substantially the same responsibilities.

12. There are 1,442,222 shares of AFS stock issued and outstanding owned by the following:

| | | |
|---|---|---|
| Edward Satell | — | 960,000 shares |
| James Brown | — | 20,000 shares |

sets forth the procedures and standards for extending credit pursuant to the program; and

(ii) the program is established and administered to extend credit to a class of persons who, pursuant to the customary standards of creditworthiness used by the organization extending the credit, either probably would not receive such credit or probably would receive it on less favorable terms than are ordinarily available to other applicants applying to the organization for a similar type and amount of credit.

(b) Applicability of other rules. (1) All of the provisions of this Part shall apply to each of the special purpose credit programs described in subsection (a) to the extent that those provisions are not inconsistent with the provisions of this section.

(2) A program described in subsections (a)(2) or (a)(3) shall qualify as a special purpose credit program under subsection (a) only if it was established and is administered so as not to discriminate against an applicant on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract), income derived from a public assistance program, or good faith exercise of any right under the Consumer Credit Protection Act or any State law upon which an exemption has been granted therefrom by the Board; except that all program participants may be required to share one or more of those characteristics so long as the program was not established and is not administered with the purpose of evading the requirements of the Act or this Part.

(c) Special rule concerning requests and use of information. If all participants in a special purpose credit program described in subsection (a) are or will be required to possess one or more common characteristics relating to race, color, religion, national origin, sex, marital status, age, or receipt of income from a public assistance program and if the special purpose credit program otherwise satisfies the requirements of subsection (a), then, notwithstanding the prohibitions of sections 202.5 and 202.6, the creditor may request of an applicant and may consider, in determining eligibility for such program, information regarding the common characteristics required for eligibility. In such circumstances, the solicitation and consideration of that information shall not constitute unlawful discrimination for the purposes of the Act or this Part.

| | | |
|---|---|---|
| Mary Zeises | — | 10,000 shares |
| AFS Treasury Stock | — | 452,222 shares |

13. First National Acceptance Corporation (hereinafter "FNAC") is a wholly owned subsidiary of AFS. FNAC is organized under the laws of the Commonwealth of Pennsylvania with its principal offices located at 715 Lancaster Avenue, Bryn Mawr, PA. FNAC performs the billing and collection responsibilities for certain sales contracts generated by AFS.

14. FNAC does business in the Eastern District of Pennsylvania.

15. FNAC is a creditor subject to the provisions of the Equal Credit Opportunity Act, 15 U.S.C. § 1691–1691f.

16. FNAC's officers are Edward M. Satell and James Brown.

17. The function of the AFS sales committee is, among other things, to review sales performance, to facilitate communication among persons involved with sales performance, and to review sales ideas for the future.

18. From the incorporation of AFS to the present, Edward M. Satell, James Brown, and Marty Zeises have served on the AFS sales committee.

19. The function of the AFS finance committee is, among other things, to review financial performance and the financial needs of the company.

20. From the incorporation of AFS to the present, Edward Satell and James Brown have been members of the AFS finance committee.

21. Since AFS' incorporation, Edward Satell and James Brown have been involved with establishing the credit policies of AFS.

22. Edward Satell regularly participates in the decision of whether or not to extend credit to classes of applicants for credit from AFS and regularly arranges for the extension of credit to groups of persons.

23. Edward Satell regularly participates in making decisions concerning the terms and conditions upon which credit is granted to AFS customers and in the establishment of criteria for evaluating credit applicants.

24. James Brown is in charge of AFS' credit department.

25. Since AFS' incorporation, James Brown has had the responsibility for evaluating the creditworthiness of individual credit applicants in those instances where individual applicants have been evaluated.

25A. Since AFS' incorporation, Edward Satell has been involved with establishing the sales policies of AFS.

26. Since AFS' incorporation, Edward Satell and James Brown have been involved with establishing AFS' compensation policies for individuals involved in the sale of merchandise to the public.

27. Since AFS' incorporation, Edward Satell and Marty Zeises, among others, have established training programs for sales personnel, have written training material for sales personnel, and have conducted training programs for sales personnel.

28. AFS' marketing program is divided into two separate programs. One program, called the American Prestige Series, is primarily conducted during the traditional school year and is designed to sell kitchenware and tabletop products to college students by making sales demonstrations to groups of students in their college residences. The other program is primarily conducted during the summer months when sales of kitchenware and tabletop products are made through a sales presentation in the purchaser's home.

28(a). The testimony was undisputed that AFS is unique in the credit field because it is successful in extending credit to young people who would otherwise be unable to obtain credit in the traditional marketplace.

28(b). The testimony was also undisputed that AFS programs have a social utility in that they afford young people, including minorities, an opportunity to obtain credit despite their youth and lack of prior credit history.

28(c). AFS has a laudable objective of providing credit to the maximum extent possible consistent with its ability to make a

profit and to expand credit to young people based on AFS's general operating experience.

28(d). AFS misinterpreted the ECOA and Treasury Regulations to permit them to identify a preferred group within the special social need category to which their programs were targeted.

29. AFS, believing it could legally do so, and using payment history data gathered to determine ways to extend credit while maximizing profit, concedes that it intentionally differentiated among applicants for credit in its college and summer sales programs between the ages of 18–21 on the basis of race, sex and marital status.

30. Prior to the 1979 summer sales season, AFS had no credit program formally described in writing or designated as a "special purpose credit program."

31. Prior to establishing and committing itself to a "special purpose credit program," AFS did not seek the advice of the Treasury Department, as it could have, though was not required to, under 12 C.F.R. § 202.1(d).[3]

32. AFS intended to differentiate on the basis of race, sex and marital status as described above since its incorporation in mid-1973 and prior to the passage of the ECOA in 1975.

33. AFS's primary sales target has always been the white single female population between the age of 18–21 living at her parents' home and with a parent who could co-sign for the credit extension. It has encouraged sales to this preferred group by adoption of a policy (by specific directions to its sales force), to sell in areas believed to be all white, or predominantly white, and by avoiding sales areas where the minority population might be substantial. It has dis-

couraged sales personnel to pursue minority or non-preferred groups through deferred commission arrangements on such sales which arrangements are markedly different from, and substantially less lucrative than, the immediate full commission arrangements for sales to the preferred market group of white single females between the ages of 18 and 21.

34. Although AFS's minority sales gradually rose in 1980–81 to approximately 13% of all sales, historically the percentage of such sales has been very low because AFS does not seek to sell to a class of minority females. The non-preferred sales, which are to almost all black females, are explained by mostly unavoidable encounters of salespersons with black or other minority persons as part of "mixed audiences" in markets targeted by AFS as "all-white colleges," "all white neighborhoods" and "all white high schools."

35. AFS avoids black or other minority population areas because of its belief that though there will be a high volume of sales, even on a deferred basis, there will also be a concomitantly high degree of defaults or bad accounts. This, it asserts, would be an undue risk to its margin of narrow profit since an unacceptably large portion of its overhead costs would have to be devoted to collection efforts.

36. On all deferred shipment sales, a large deposit is encouraged to be made although the minimum applicable to all sales will be accepted. The merchandise is not delivered and remains in the possession of AFS until it is paid for in full or the company is satisfied that the person is a creditworthy risk, having made a certain number of successive monthly payments. On all defaulted deferred shipment accounts AFS

**3.** Section 202.1(d) provides in pertinent part:
 Issuance of staff interpretations.
 (1) Unofficial staff interpretations will be issued at the staff's discretion where the protection of section 706(e) of the Act is neither requested nor required, or where a rapid response is necessary.
 (2)(i) Official staff interpretations will be issued at the discretion of designated officials. No such interpretation will be issued approv-

ing creditors' forms or statements. Any request for an official staff interpretation of this part must be in writing and addressed to the Director of the Division of Consumer Affairs, Board of Governors of the Federal Reserve System, Washington, D.C. 20551. The request must contain a complete statement of all relevant facts concerning the credit transaction or arrangement and must include copies of all pertinent documents.

not only retains the merchandise, but also retains any deposits and payments made on accounts. Presently, for deferred accounts, largely minority, AFS finds that three successive payments evidence reliable creditworthiness although prior to the 1978–1979 sales seasons, a minimum of 6 to 8 consecutive monthly payments was required.

37. Only about 10% of AFS's total summer sales are outside the age range of 18–21 and the non-college sales are *de minimus* in the winter sales season.

38. In addition to their standard credit test, AFS states that they have three special purpose credit programs—two in the winter and one in the summer.

39. In the summer sales program, the white single employed female between the age of 18–21 and living at home with a parent able to co-sign the credit application is the primary sales target for the company. AFS's policy with respect to such sales is immediate shipment of goods without credit checks of either the applicant or parent co-signer. Parents are not required but are requested to sign the credit application.

40. On the other hand, as to all persons outside the prime sales target group, principally minority females of the same age group, sales are not encouraged. Should sales be made to them, they are on a deferred shipment basis and the applicant and parent co-signer are subjected to individual credit checks. Parents are strongly encouraged to co-sign in those instances where, if the children have no prior credit, the purchase is to be based on the parents' credit. About 80% of the persons in this non-preferred category do qualify for credit under the AFS customary credit standards. Upon credit approval, the goods are shipped.

The treatment of this category of non-preferred sales is supposed to be a separate special purpose credit program. The groups of persons falling into this category are all males, all married couples and all minorities of all races and colors other than white.

41. In the college or winter sales program there is an intended special purpose credit program for credit sales to four year college white single females, other than freshmen. A separate program exists for all other categories of persons.

42. White females in four year colleges who are seniors, juniors or sophomores are treated as preferred sales targets, regardless of age, prior credit histories, or any other normal indicia of creditworthiness. Sales to this group are always made on an immediate shipment basis unless there is a specific request for delay in shipment.

All students in colleges having less than four year programs are sold on a deferred shipment basis.

43. White persons predominate in the number of non-preferred sales. However, if the number of sales made to black and white purchasers were more nearly equal, the percentages of sales to each group would show that black customers predominate in the deferred sales category.

44. Black females and others in the same college years, including all freshmen, are automatically treated on a deferred shipment basis. If there is an inquiry, they are encouraged to buy on a deferred shipment basis, but if they insist, they receive immediate shipment. Currently, after three successive payments, the purchaser is eligible to receive shipment of the goods. The finance charges are the same whether there is deferred or immediate shipment.

45. There are no credit checks of any applicant in the winter program and there is no parental co-signer requested for any sale.

46. AFS' summer sales program targeted to white single females living at home with at least one parent available to co-sign the credit application, does not, standing alone, qualify as a special purpose credit program. The credit extension is intended for the white parent. The white parent who is already presumed creditworthy by AFS, is not, therefore, in need of special credit treatment and, in any event, is beyond the age group of 18 to 21.

47. The record evidence is uncontradicted that nation-wide, credit is available to persons 18 to 21 who do not themselves

have prior credit experience if a parent co-signs who is creditworthy.

48. AFS has therefore targeted its primary sales efforts to a market to which credit is normally available.

49. I do not credit AFS' contention that its primary sales market is distinguished by the fact that a parent is requested to co-sign but is not required to do so. The market is targeted with the expectation that a parent will co-sign. The prospective purchaser is not informed in advance of the sales presentation that the parent is not required to co-sign. If the parent refuses to co-sign, the salesperson informs the purchaser that credit will nevertheless be extended to the child.

50. Over 75% of the credit applications are co-signed in this primary summer market, supporting the conclusion that the sales effort is designed initially to lead the purchaser and parent to believe that co-signing is required and not optional. Accepting the credit application after parental refusal to co-sign is not responsive to a special social need of the youth involved, but is a sales technique to consummate the sale while indirectly generating parental responsibility for the sale.

51. The summer sales program for minority and other non-preferred applicants is also not a special purpose credit program. The distinction made on the basis of race is not a reflection of a different "special social need" from that experienced by the primary marketing group, but rather is a reflection of the individual business judgment of AFS on how best to retail its product.

52. Persons in the non-preferred group have to meet the customary credit standards to obtain immediate shipment. If youth in this category are not able to meet those standards, the parent is required to co-sign and withstand a credit check against the AFS customary credit standards. Since there is no deviation from the customary credit standards and because credit would normally be available when a creditworthy parent co-signs, there is no special need exception extended to youth in this category.

53. The spouse of a married applicant is "requested" to co-sign in the same manner as parents of youth purchasers and with the same intent of obtaining the co-signature without first having to disclose that it is not required.

54. As in the summer sales programs, there is no difference in the special social need among prospective applicants for credit in the winter sales program based upon race, sex, year in school or marital status and hence no rational reason to distinguish among them. The prohibited distinctions are based upon AFS' exercise of business judgment and not upon a difference in special social needs among youths 18–21 or year in school.

55. Although AFS believes that it has three separate special purpose credit programs, all customers, whether a racial minority or white, single or married, preferred or non-preferred, are told that there is but one credit program objective; that is to sell quality products to females principally between the ages of 18–21 and to make credit available on credit terms outside of the customary credit standards. There is no policy of publication to prospective applicants that they are participants in any special credit purpose program. All applicants between 18–21 are carefully led to believe that they are being treated the same as all other applicants.

56. AFS does not tell minorities or other non-preferred groups that their credit terms are different because of race, sex or marital status. It acknowledges that to do so would cause humiliation, embarrassment and distress to the applicants. Such disclosure would obviously discourage sales and risk harm to the reputation of the company. Consequently, all sales persons are instructed to extend credit on an immediate ship basis to any minority or non-preferred group buyer who insists upon it.

57. Because the participants in the AFS "special purpose credit programs" for non-preferred sales are not told that they fall into this category, they are not offered a special purpose credit program opportunity

which they would also have the opportunity of declining.

58. Non-preferred "special purpose credit programs" customers do not receive notice of adverse action, that is, that they are being rejected for the credit terms extended to other persons identically situated, except for the characteristics of race, sex, marital status, or year in school.

59. AFS credit extension programs do not qualify as special purpose credit programs because they are not offered within the meaning of the ECOA nor are minority applicants informed they are participants in such a "special purpose credit program" within the scope of Regulation B.

60. Generally, in AFS "special purpose credit programs," individual applications are not considered for creditworthiness against any criteria except the applicant's race, sex, marital status or year in school. Each minority or other non-preferred customer has to prove individual creditworthiness to obtain credit while preferred customers, who receive immediate shipment, do not.

61. AFS seeks to justify its credit extension distinctions based upon sales and account currency statistics generated originally by its predecessor company, American Foresight, which purport to show that minority customers, as a group, are less creditworthy than white counterparts. However, there has been no showing by AFS that the statistics generated by American Foresight were valid and non-biased. Nevertheless, in mid-1973, AFS used this data to map out a market of white single females as its primary sales target group to which sales were encouraged and credit made immediately available. Sales to minorities as a class were discouraged and, if sold, credit to minorities was deferred since shipments were deferred until payment was made.

62. Although AFS did not use a racial coding system, in the 1973–74 sales seasons, in reliance on the American Foresight data, it did distinguish minority applicants by instructing salespersons that all sales to minorities were to be on a deferred shipment basis only. Sophomores and freshmen were also deferred regardless of race, sex, age or marital status.

63. In the 1974–75 sales seasons, AFS began to employ a formal racial coding system on its sales contracts and account records. It sought to obtain new empirical data for decision making in development of a credit extension policy. Those minorities and freshmen to whom sales were made, though discouraged, were all sold on a deferred shipment basis.

64. In 1975–1976, sales to minorities continued to be discouraged and sales to white single females continued to be the only primary sales market target. Due to financing problems on deferred sales agreements, immediate shipments were made to all customers.

65. Based solely on race, and separately for college year, AFS made a study of its accounts for the 1975–1976 season which indicated that the minorities, sophomores and freshmen tended to be more delinquent than white female four year college upper class accounts.

66. In 1976–1977, AFS continued the racial coding system and resumed its previous deferral of sales to all minorities and freshmen.

67. AFS discovered in its analysis of data for 1976–1977 that its sales persons were miscoding minority sales as white sales in order to qualify for immediate sales commissions. The number of miscoded accounts is not known. A quality bonus system was installed to attempt to correct temptation or tendency to miscode, but there is no record information to gauge its success in the face of a compensation system that continued to provide a strong pecuniary motive for miscoding by dramatically favoring immediate compensation for preferred group sales as opposed to the deferred compensation program for deferred non-preferred sales.

68. The same coding and sales system was operating in 1978–1979, except that Spanish surnamed persons and Orientals were separately coded because of expansion of AFS sales to the western part of the

United States. Prior thereto, all such sales had either been coded as white or black.

69. From November, 1978 through August, 1979, AFS dropped the racial codes. Therefore, it cannot be determined for that period what the delinquency rate was for minority accounts. Minorities were still sold goods on a deferred basis.

70. From September, 1979 to the present the racial coding has been resumed based on a belief derived from internally generated data that minority accounts are still less creditworthy than those of the preferred market group.

71. AFS's coding system and experimental data analysis are racially suspect, and thus invalid, because its commission system for salespersons was orientated towards the primary market group and created a motive for the misrepresentation of black sales as white sales to gain immediate commissions. The Government's witness evidence, corroborated by the defendant's own experience, shows that some salespersons miscoded black sales as white sales to obtain immediate commissions, even though this was against AFS' specific instructions to the contrary.

72. AFS instituted, and still has, a quality bonus system to insure compliance with the company's instructions. However, AFS' statistical analyses did not take into account nor correct for the motive and instances of intentional miscoding of applications.

73. In any year where coding was undertaken, the number of listed minority sales was so small compared to listed preferred sales that intentional miscodings by a few salespersons could have a significant effect upon the analysis for minority account delinquencies.

74. The coding system is also numerically suspect because AFS relied upon visual observations of the salespersons. Spanish surnamed persons, Orientals and blacks were subject to be miscoded as white sales because of color of skin, surname or the apparent absence of some other racial or ethnic stereotypical characteristic. Applicants were not asked their race or ethnic background.

75. At no time did AFS or its predecessor, American Foresight, employ a statistically non-biased data collection model to develop the conclusions upon which it relied to differentiate on the basis of characteristics otherwise prohibited by the ECOA.

75(a). AFS presented evidence by Dr. David Hildebrand, a professor of statistics at the University of Pennsylvania, Wharton School of Business, who believed that AFS' "special purpose credit programs" were founded on sound statistical principles. Dr. Hildebrand testified that AFS' data base was adequate and that he could not find any systematic errors that would affect his statistical findings.

75(b). Dr. Bernard Siskin, a statistical expert who testified for the Government, conceded that assuming AFS' data were statistically valid, its data showed default rates between minorities and non-minorities to be consistently and statistically significant, and that the difference between shipped and deferred sales had no effect on default rates.

76. The testimony of Dr. Bernard Siskin is credited that the AFS data system and analyses are statistically biased and, therefore, statistically unreliable, because it was the AFS sales policy to discourage sales to the class of minority persons or other non-preferred groups between the ages of 18–21 while encouraging sales to the preferred market group.

77. Further, the testimony of Dr. Siskin is credited that AFS data and analyses are statistically invalid because they fail to show a valid statistical basis for exclusion of factors other than race, sex and marital status, which reasonably could influence the default or delinquency rates of accounts, such as income level of applicants, differences in sales presentations, reputation of the creditor, AFS selective sales market policy, or the influence of deferred shipments on customers generally.

78. The distinctions made by AFS among the groups within the 18–21 age

group or year in school are not designed to accomplish a "special social need" as defined in the ECOA.

79. The alleged "special purpose credit programs" of AFS do not meet a "special social need" under the Act. Neither the sales program nor the policy is designed to extend credit to minorities or the non-preferred categories of persons as a class but rather is designed to extend credit only to those minorities or non-preferred sales who are unavoidably encountered in AFS when it attempts to reach the class of white females falling into the primary market group.

80. AFS has had difficulty obtaining lenders to finance or purchase deferred sales contracts, as opposed to immediate shipment contracts. However, AFS does not contend that the reason is in any way related to any lender policy based upon race, color, sex or marital status.

81. Nationally, all youths between the ages of 18 and 21, who are not regularly employed and who have not had prior credit experience are considered to be less than creditworthy and cannot obtain credit without a parental co-signer who is creditworthy. This is so regardless of race, color, marital status, or year in school. Because one of the purposes of the ECOA is to promote equal and non-discriminatory access to credit opportunity in a credit oriented society, extension of credit by a profit-making organization to persons otherwise disabled credit-wise, could constitute meeting a special social need through a special purpose credit program.

82. Though AFS purports to meet three separate "special social needs" using three separate programs, AFS, in fact, has properly identified and attempted to address only one special social need common to all three programs—namely, credit opportunity commonly denied to all members of the age group 18 to 21 who have no prior credit history.

83. Additional findings of fact in the appendix to this opinion supplement all of the foregoing and are incorporated herein by reference.

## DISCUSSION

The purpose of the ECOA is to promote equal credit opportunity through elimination of specified non-objective factors such as race, sex, and marital status. The ECOA also recognizes that because of economic disadvantages and special social needs, certain classes of persons cannot realistically participate in the credit market when customary lending standards are applied. Consequently, the ECOA provides that it shall not be a violation if credit terms offered to persons participating in special purpose credit programs are denied to persons who would meet the creditor's customary credit standards. 15 U.S.C. § 1691(c)(3). Although the ECOA does not expressly state that the credit terms extended pursuant to a special purpose credit program must be more favorable than customary credit terms, this is implied by the special purpose credit program exemption and by the requirement that the special programs meet special social needs. *Id.*

A profit-making organization such as AFS is authorized to offer a special purpose credit program to meet special social needs. Any such program must meet standards prescribed by Regulations of the Board of Governors of the Federal Reserve System ("Board"). *Id.* Effective March 23, 1977, the Board promulgated Regulation B, 12 C.F.R. § 202 *et seq.*,[4] to effectuate the purposes of the ECOA. Regulation B does not specify the special social needs to be addressed by special purpose credit programs. It would seem that any rationally identified social need would qualify so long as it is special and is neither singled out with the intent, nor has the effect, of circumventing the non-discrimination provisions of the ECOA and the implementing regulations.

■ AFS is a creditor. Defendant Edward Satell, however, contends that under the evidence he is not a creditor within the meaning of the ECOA or Regulation B.

4. *See* footnote 2 *supra.*

The ECOA defines creditor as "any person who regularly extends, renews or continues credit; any person who regularly arranges for the extension, renewal or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew or continue credit." 15 U.S.C. § 1691a(e). Regulation B defines creditor as "a person who, in the ordinary course of business, regularly participates in the decision of whether or not to extend credit." 12 C.F.R. § 202.2(1). As the chief operating officer and 97% stockholder of AFS, Satell regularly participates in determining policy for the extension of credit to all classifications of customers. Salespersons do not have discretion to deviate from that policy. Though he may not personally or directly review each credit application, there is no need to do so since the bulk of AFS sales credit is not generally extended based on a review of individual creditworthiness. Therefore, Satell is a creditor within the meaning of the Act and its implementing regulations.

Defendant, First National Acceptance Corporation (FNAC) is also a creditor;[5] it is a wholly owned subsidiary of AFS, Satell is its president and James Brown, the AFS vice president, is its vice president. FNAC's business is the billing and collection of the credit transactions secured through AFS sales. On deferred accounts this would include determinations of when an account was creditworthy so as to offer shipment of the goods prior to full payment. Consequently, FNAC is a participant with AFS in carrying out AFS credit policies.

 In this action for injunctive relief, the United States has the burden of proof that the defendant creditors have violated the ECOA. Although the ECOA is silent regarding the standard of proof to be applied, no reason exits to apply a stricter standard than a preponderance of the evidence in assessing whether defendants' special credit purpose programs are either established or administered with the purpose of evading the requirements of the ECOA or Regulation B or whether in the absence of purposeful discrimination, equitable relief is necessary to enforce the requirements imposed by law. See 15 U.S.C. §§ 1691c and 1691e. I find beyond question that the United States has met its burden and that injunctive relief is warranted.

Despite their contentions that they have three separate special purpose credit programs, defendants identified but one special social need—the extension of credit to the class of youth between the ages of 18 and 21 excluded from the customary credit market due to the lack of prior credit experience. Each youth applicant in this category, irrespective of race, color, marital status or year in college, shares the same credit disability. There is no evidence warranting the distinctions made by defendants between applicants based upon race, marital status or other prohibited bases with respect to this special social need.

AFS does not contest *what* it has done but whether its admitted practices were contrary to the law. Defendants admittedly differentiate in credit extensions between participants in their credit programs, not on the basis of a difference in credit need, but rather on the assumption that certain classes of society are less creditworthy than the market target group—the white single female. The credit terms extended to the primary marketing group, which constitutes the vast majority of defendants' sales, could be deemed the "customary standards of creditworthiness" against which to gauge compliance with the ECOA.

None of the applicants in the primary group has prior credit. Hence, there is no basis for applying less favorable credit terms to minorities, married persons or other discriminatees. However less favorable credit terms are extended to non-preferred customers than to the primary marketing targets. Such distinctions are not responsive and remedial of a special social need of the disadvantaged but relate solely to de-

---

**5.** A corporation is deemed to be a "person" under the applicable statute and regulations.

See 15 U.S.C. § 1691a(f) and 12 C.F.R. § 202.2(x).

fendants' conscious marketing decision to maximize profits by excluding, or severely restricting, the socially disadvantaged from its credit market.

■ In order for a special purpose credit program to qualify, the credit extension terms for participants must be no less favorable than credit given to defendants' primary credit applicants to whom credit is ordinarily available for similar types and amounts. Therefore, I conclude that as a matter of law the credit extension programs for AFS non-preferred customers, (minorities, married persons and college students other than sophomores, juniors and seniors in four year colleges), are not designed to, and do not, benefit those groups in comparison with the preferred customers identically situated. Defendants' programs, as established and administered, have the clear effect of discriminating on prohibited bases without meeting any special social needs.

■ Defendants assert that section 202.-8(c) of Regulation B authorizes the use of demographic data to establish creditworthiness criteria among applicants based upon otherwise prohibited bases.[6] This argument fails. While inquiry as to race, sex or marital status may be permitted to ascertain the eligibility of an applicant to participate in the same special purpose credit program, there is no authorization for use of the demographic data to discriminate among persons having the same need. This provision of the regulation merely recognizes that many persons *regardless* of race, sex, or marital status may share the same disadvantage and permits such credit inquiry into those common characteristics as may be required *for participation in the same*

program designed to meet the common social need.

AFS asserts that the discriminatory distinctions made are necessary so it can afford to give credit to minorities and other non-preferred customers. This argument is not recognition of a special social need for customers but only a marketing approach of the creditors to insure their profits by restricting credit opportunities based on race, sex, and marital status in violation of the ECOA.

Defendants argue that their own statistical analyses justify the assigning of a negative value to the prospective accounts of minorities and others. Only as to age does the ECOA permit a creditor to use an empirically derived credit system with respect to an otherwise protected classification for purposes of determining creditworthiness. *See* 15 U.S.C. § 1691(b)(3). *See also* 12 C.F.R. § 202.6(b). Even then, the system must be demonstrably and statistically sound in accordance with regulations of the Board and, most importantly, in the operation of any such system, the age of an elderly applicant may not be assigned a negative factor or value. One may infer from this statutory provision that the use of empirically derived systems for other classifications of persons protected under the ECOA is absolutely prohibited, or at least that any empirically derived system may not assign a *negative* value to characteristics such as race, color, sex or marital status as do defendants.

Even assuming AFS's statistics were demonstrably and statistically sound, the distinctions in the credit programs would not be protected under either the ECOA or Regulation B; so long as the protected group is assigned less favorable credit terms than others, there is unlawful dis-

6. 12 C.F.R. § 202.8(c) provides that:

[I]f all participants in a special purpose credit program described in paragraph (a) of this section are or will be required to possess one or more common characteristics relating to race, color, religion, national origin, sex, marital status, age or receipt of income from a public assistance program and if the special purpose credit program otherwise satisfies the requirements of paragraph (a) of this

section, then, notwithstanding the prohibitions of §§ 202.5 and 202.6, the creditor may request of an applicant and may consider, in determining eligibility for such program, information regarding the common characteristics required for eligibility. In such circumstances, the solicitation and consideration of that information shall not constitute unlawful discrimination for the purposes of the Act or this part.

crimination whether disguised or well-intended. Where the individual applicant is subject to adverse treatment based upon group performance, he or she is victimized by the stigma of race, color, sex, marital status and other criteria specifically prohibited under the ECOA for the benefit of the individual's equal credit opportunity.

The ECOA creates in each individual applicant a direct right to challenge a credit denial or credit practice believed to be discriminatory. 15 U.S.C. § 1691e(a)[7]. This right is not diminished by the provision of the ECOA recognizing the need for some disparate, but not less favorable, treatment to meet special social needs. Likewise, the ECOA places the burden upon the creditor to justify the special social needs and any disparate treatment to each credit applicant against whom adverse action is taken. 15 U.S.C. § 1691(d).[8]

Extension of credit on a discriminatory basis within a special purpose credit program is a denial of equal credit opportunity and therefore a denial of credit. Each credit applicant must be able to presume equal credit opportunity will be extended on the basis of the individual credit application and on the same terms as all other persons similarly situated, unless "given" a bona fide explanation for the rejection or disparate treatment. See 12 C.F.R. § 202.9. If a person does not qualify under customary credit standards, the applicant may be offered an opportunity to participate in a special purpose credit program designed to meet a special social need. AFS does not inform minority and other non-preferred applicants for credit that they are being treated differently because it knows that to do so would be detrimental to its business

and of great humiliation and embarrassment to its customers. Such non-disclosure is inconsistent with the purposes of the ECOA.

### CONCLUSION

It would be incongruous to construe either the ECOA or Regulation B to permit either conscious discrimination against the uninformed, the misinformed or the unwilling or to make distinctions among participants in the special purpose credit program except upon defined special social need. While the ECOA appears to recognize that a creditor could have several special credit purpose programs, each would have to address a distinct special social need. To permit a creditor to discriminate on otherwise prohibited bases within the class of persons sharing the same special social need as defendants unjustifiably claim a right to do, would be a mockery of the non-discrimination provisions of the ECOA.

An appropriate order follows.

### ORDER

AND NOW, this 22nd day of December, 1982, it is hereby ORDERED that an injunction is hereby issued permanently enjoining defendants, their officers, agents, employees, successors, and all persons in active concert or participation with any of them from:

1. Discriminating in violation of the special purpose credit program provisions of the ECOA against any person participating in such a program and sharing the disability of no prior credit experience on the basis of race, color, religion, national origin, sex, marital status, or age, provided the participant has the capacity to contract;

---

7. § 1691e. Individual or class action for actual damages.

(a) Any creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.

8. Section 1691(d)(6) provides:

For purposes of this subsection, the term "adverse action" means a denial or revoca-

tion of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested. Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit.

See also 12 C.F.R. § 202.2(c).

2. Requesting the marital status of applicants for individual, unsecured credit, except as permitted under the circumstances outlined in Regulation B, 12 C.F.R. § 202.-5(d);

3. Suggesting or recommending to any applicant that she or he obtain a co-signer unless an objective determination has been made that the applicant cannot in fact meet the defendants' customary standards of creditworthiness;

4. Requiring the signature of an applicant's spouse or other person on any credit instrument if the applicant qualifies under the defendants' customary standards of creditworthiness for the amount and terms of the credit required, except as permitted under the circumstances outlined in Regulation B, 12 C.F.R. § 202.7(d);

5. Engaging in practices designed to reduce contact with prospective Black, Hispanic (includes Puerto Ricans, Mexican Americans, and others of Spanish descent), Orientals, and other minority applicants for credit;

6. Utilizing any compensation system for their employees and agents in which either the amount of compensation, or the time that the compensation is received by employees or agents, is related to the race, color, national origin, sex, marital status or year in school of the purchaser of the merchandise;

7. Failing to give timely, accurate and complete reasons for adverse action to rejected applicants to the extent required by the ECOA;

8. Engaging in racial and national origin discrimination in the recruitment and hiring of employees and agents as part of an effort to reduce contact with prospective Black and Hispanic and other minority applicants for credit;

9. Gathering or maintaining information relating to the race, color, national origin or marital status of any credit applicant, except as approved in writing by the Federal Reserve Board pursuant to Regulation B, for information deemed essential in establishing a special purpose credit program meeting the requirements of the ECOA;

10. Instructing or encouraging any employee or agent to make adverse or negative value credit or sales decisions based on the payment records of groups of AFS customers relating to customers' race, color, national origin, marital status or year in college;

FURTHER, it is ORDERED that as to the operation of any special purpose credit program, defendants shall:

11. Undertake an educational program for its agents and employees with marketing responsibilities, sales responsibilities, or credit processing responsibilities. The program shall be designed to apprise these persons of their obligations under the Equal Credit Opportunity Act and shall include:

12. Furnish to each director, officer, credit committee member and to each sales agent and sales employee a copy of the Court's Order, a copy of the Equal Credit Opportunity Act, and a copy of Regulation B.

13. Explain the requirements of the Equal Credit Opportunity Act and the Court's Order to each new employee and at each training session conducted by defendants for new employees.

14. Place conspicuously on all credit application forms (a/k/a contract or sales agreement) and on all printed promotional literature (i.e., pamphlets, brochures, etc.) in bold print and capital letters the following statement:

"IN ACCORDANCE WITH THE FEDERAL EQUAL CREDIT OPPORTUNITY ACT, AMERICAN FUTURE SYSTEMS, INC., PROVIDES EQUAL CREDIT OPPORTUNITY TO ALL PROSPECTIVE APPLICANTS FOR CREDIT IRRESPECTIVE OF RACE, COLOR, RELIGION, NATIONAL ORIGIN, MARITAL STATUS, SEX, AND AGE (PROVIDED THAT THE PROSPECTIVE APPLICANT HAS THE CAPACITY TO ENTER INTO A BINDING CONTRACT)."

15. Include in any advertising in newspapers or other media in bold print and with reasonable prominence the following statement:

"EQUAL CREDIT OPPORTUNITY— APPLICANTS WELCOME IRRESPECTIVE OF RACE, COLOR, RELIGION, NATIONAL ORIGIN, MARITAL STATUS, SEX OR AGE."

16. Institute a training and sales program designed to ensure that employees or agents who sell defendants' merchandise do not engage in practices which serve to reduce contact with prospective Black, Hispanic and other minority applicants for credit.

17. Maintain for a period of four (4) years:

(a) all credit applications received by AFS, whether accepted or rejected;

(b) all files on rejected and accepted applicants, including all documents pertaining to the processing and evaluation of the application and all documents pertaining to adverse action;

(c) all documents pertaining to sales procedures, solicitation, marketing, credit processing, credit standards, credit terms, compensation, recruitment and training, including, but not limited to, sales manuals, managers' manuals, compensation manuals, materials handed out at training sessions, recruiting manuals, and newsletters to employees and agents;

(d) all logs in which incoming credit applications are recorded and documents explaining the significance of numbers appearing in the logs;

(e) all documents explaining the compensation system for employees or agents of defendants; and

(f) all documents pertaining to the recruitment and hiring of employees.

18. Report by May 1st of each of the succeeding four (4) years from the date of this Order to the Attorney General's Office as to any and all special credit purpose programs:

(a) the total number of approved credit applications processed during the winter and summer seasons;

(b) the name and address of each credit applicant rejected during the season and the reasons given to the proposed credit program participant for rejection;

(c) the date and location of each training session held for employees or agents with sales responsibilities (including sales representative and managers) during the sales season;

(d) the name and address of each employee or agent with actual sales responsibilities (including sales representatives and managers) that were employed by, or in an agency relationship with, defendants during the sales season and the race of each employee or agent.

(e) the name, address, race and job title of any employee or agent of defendants with sales, solicitation, marketing, credit processing or evaluation, or recruitment/hiring responsibility (including sales representatives and managers) whose employment or agency relationship with the defendants was terminated (whether terminated by defendants, or by the agent or employee) during the sales season and the reason for the termination.

(f) a sample of advertisements published for the purpose of recruiting sales employees or sales agents for the sale season which the report covers, the date(s) each advertisement was run, and the name of the newspaper in which each advertisement was placed.

(g) the name and address of every institution of higher learning at which a show was held; (if the show was held in an apartment, use the name of the institution of higher learning from which the attendees were drawn) and the number of shows held at each institution.

This court shall retain jurisdiction to enforce the provisions herein.

## APPENDIX

1. Lynn Banta was a member of the AFS sales committee from 1973 until December, 1975.

2. Sybil Melton was a member of the AFS sales committee from at least October 31, 1975, until June, 1977.

3. Robert Birnbaum began serving on the AFS sales committee prior to October 31, 1975, and still serves on the committee.

4. Carl Weinberg began serving on the AFS sales committee in September, 1978 and still serves on the committee.

5. Phil Ahr began serving on the AFS sales committee in September, 1979 and still serves on the committee.

6. Dawn Chamberlain began serving on the AFS sales committee in April, 1980 and continued through August, 1980.

7. Charlene Agurs began serving on the AFS sales committee in April, 1980 and still serves on the committee.

8. Various other sales and management personnel, including, but not limited to, Robert Birnbaum and Sybil Melton (until her separation from AFS), have assisted in presenting AFS' program, policies and practices at training sessions.

9. During the summer sales season, AFS establishes local branch offices. Regional managers have the responsibility for overseeing a group of local branch offices. Each branch office is run by a district manager. Below, the district manager are one or more sales managers, usually college students who worked as AFS sales representatives during previous summers. District and sales managers supervise sales representatives. Sales representatives, usually college students, work out of the branch offices.

10. Sales representatives are responsible for the sale of merchandise. The sales manager is responsible for the recruiting and training of sales representatives and the sale of merchandise both with sales representatives and on their own. District managers are responsible for the management of the summer sales office, the recruitment and training of sales personnel as well as some sale of merchandise in conjunction with sales representatives.

11. All summer credit applications are forwarded to the AFS central office after a sale is made.

12. Managers with recruitment responsibilities are given suggestions by AFS relating to discouraging unsuitable student applicants.

13. Some AFS management personnel routinely avoid recruiting and hiring black persons to sell AFS merchandise and advise other AFS personnel with recruiting and hiring responsibilities to avoid hiring black persons in order to facilitate the implementation of AFS' credit policies and their own income potential though the primary market is of white single females.

14. In situations where AFS screens persons seeking employment by conducting a group and then a personal interview, a variety of methods are used, including, but not limited to, the following:

(1) White persons who are otherwise acceptable are told to call back, while black persons are told that defendants will call them back if they are acceptable. The black persons are not called back.

(2) During the personal interviews, the black persons are discouraged and given a negative image of the job; white persons are informed about the attractive aspects of the job. If a black person applies anyway, he is rejected.

(3) During the group interview everyone is told to call back. However, applications of black persons are sorted out and marked, for example, with a star, and when a black applicant calls back he is told no job is available. These applications are then destroyed.

(4) The names of white applicants are sent on to the central office in Bryn Mawr whereas the names of black applicants are not sent on.

(5) When advertising for summer employees in newspapers, advertisements are often placed in media which serve white suburban areas whereas black media are avoided.

15. AFS' job applications from black persons have been marked with the words

"code 2" as a method of identifying black persons so that they are not hired.

16. During the 1979 summer sales season Marty Zeises was Regional Manager for New England and Northern New Jersey. Edward Satell was Regional Manager for Pennsylvania, Southern New Jersey, Maryland and the District of Columbia.

17. Edward Satell, Marty Zeises and Robert Birnbaum were Regional Managers for the 1980 summer sales season.

18. Students recruited by AFS as summer sales representatives are trained at a training center. There are generally 4 or 5 training centers, each conducted at a college campus. Sales representatives receive additional training at their assigned branch offices during which they give sales demonstrations at which a manager is present to give advice and instructions.

19. Between 300–500 students per summer participate in summer training sessions for prospective sales representatives; only 75–150 trainees complete the sales season. Since 1973, approximately 3000 young people have been through such training sessions.

20. The senior AFS persons at the summer training center are the trainers, who are in charge of all activities at the center and handle the training of representatives and managers. The trainers review the entire training program.

21. Students recruited by AFS to attend a summer training session are encouraged to bring a current high school yearbook and a local telephone book.

22. These students receive a $25 bonus from AFS for bringing to the training center a list of twenty-five names and addresses of single working women who have recently been graduated from high school.

23. AFS summer sales personnel do not canvass on a door-to-door basis. Rather, sales personnel call on single working girls whose names they obtain from a variety of sources. These sources include high school yearbooks, high school graduation lists published in newspapers, voter registration lists, engagement notices, friends, referrals from persons before whom a sales presentation was made, and "prospecting" in the community.

24. AFS recommends that sales representatives concentrate on an area reasonably close to where the sales representative lives.

25. If an AFS sales representative calls on a woman who is not in a position to buy because she is not working or has recently married, i.e., an "unqualified" prospect, the representative is instructed to ask the woman for the names of single, working women.

26. From at least the summer of 1975 and continuing through the present, code letters have been printed on the AFS summer credit application. The code letters refer to purchaser characteristics. The code letters have the following significance:

Summers, 1975, 1976

G = General (Single non-minority female, 18–21 living at home, with parents co-signing)

M = Minority (Black, Hispanic)

P = Person living in low-income housing project

C = Couple (Married)

A = Apartment Girl (Single female living in apartment)

S = Single Girl (Single female living at home without a parent co-signing)

Summer, 1977

G = General (Single non-minority female, 18–21 living at home, with parents co-signing)

M = Minority (Black, Hispanic)

P = Person living in low-income housing project

C = Couple (Married)

A = Apartment Girl (Single female living in apartment)

S = Single Girl (Single female living at home without a parent co-signing)

O = Oriental

X = Mexican

Summer, 1978

G = General (working person living at home, parents co-signing; telephone in

home; no previous established credit in person's name)

S = Same characteristics as a G, except no parent co-signer

C = Parent of a G sale

X = All others

Summers 1979, 1980, 1981 (two sets of codes):

Set I—"G" working woman living with parents—between the ages of 17–21 years and with a parent co-signer.

"S" same as a "G" sale except parent does not co-sign

"P" the parent of a "G" sale

"A" single woman who lives away from her parents

"X" this includes all those over 21 years old and those not covered in other categories.

Set II—Codes of Race and National Origin

"C" Caucasian

"O" Oriental

"M" Black and Hispanic

27. During the 1979, 1980 and 1981 summer sales season the "X" category included, among others, married couples (except for parents of a "G" sale), men, and persons over 21.

28. During 1973, a sale to a minority student was referred to by AFS as a "code 2" sale.

29. From at least the summer of 1975 and continuing through the present, AFS summer sales personnel have been required to code each sales contract in accordance with the characteristics of the particular customer by marking the applicable code letters (see fact 59 above).

30. Summer district and sales managers are required to ensure that all contracts are coded in accordance with the AFS code.

31. From 1975–1981 the maximum deposit amount a summer sales representative could keep after making a sale has been $20.00. Deposits over $20 had to be turned into AFS. Deposits constitute a part of the representative's commission.

32. During the 1975 and 1976 summer sales seasons commission paid on cancelled accounts and on accounts that did not make their payments were charged back to the representative, if still with AFS.

33. During the 1975 and 1976 summer sales seasons, AFS sales representatives could earn a scholarship. The scholarship, payable in the December following the summer, was based on sales volume exclusive of cancellations and of sales in which the customer was not current in payments as defined in the summer compensation manual.

34. During the 1975, 1976 and 1977 sales seasons, full commission was paid immediately to representatives only on a "G" sale. On all other sales the representative could keep the deposit amount up to $20. The balance of the commission was paid in December following the summer sales season as long as the customer had made one payment and was no more than 59 days delinquent. For commission purposes, uncoded contracts were treated as non-G sales in 1976 and 1977 but not in 1975.

35. AFS instituted a quality bonus system for the 1977 summer sales season. Under this system a sales representative who completed the summer in accordance with AFS rules would receive a bonus in December provided that 85% of the accounts sold by the representative during the summer were on current status as of December 5, 1977. Current status meant that the customer had made at least one full monthly payment and was not more than 30 days overdue on December 5, 1977.

36. The calculation of the quality bonus in the 1977 summer sales season was based on the same percentage as the percentage of amounts on current status on December 5, 1977. For example, if 92% of the amounts were current, the quality bonus given to the sales representative was also 92%.

37. One of the motivations for instituting the quality bonus system in the summer of 1977 was to deter sales personnel from coding minority sales as non-minority sales.

38. During the 1977 sales season, representatives were informed that those who sold "quality business" received additional rewards and that they should be able to earn the quality bonus if they followed AFS suggestions. Representatives were also informed that they had the biggest influence on their sales by the honesty of their efforts and by the neighborhoods in which they selected to sell.

39. Similar to the preceding years, during the 1978 summer sales season, full commission was paid immediately on "G" sales and "S" sales. On all other sales, ("C" and "X"), only one half of the commission was paid immediately, the balance being paid in December as long as the customer had paid in accordance with his/her agreement. Uncoded contracts were treated as "X" sales.

40. During the 1979, 1980, and 1981 summer sales seasons, full commission was paid immediately on "G" sales and "S" sales but on all other sales only half of the commission was paid immediately. The balance was paid in December provided that the customer was current in payments as defined in the compensation manual.

41. During the AFS summer sales seasons 1977–81, commission payments were considered as advances to sales representatives conditional upon the customer's fulfilling the terms of the sales contract up to December 5 of that year. Commission earned by a representative on a cancelled account was charged back to the representative if the representative was still with the company and had additional income due.

42. During the 1978–1981 summer sales seasons, AFS sales representatives were entitled to receive scholarship payments in December provided that they met AFS summer program requirements. Scholarship amounts were based on a representative's sales volume less any cancellations. Commission earned by representatives on accounts that became seriously delinquent were charged back against the scholarship amount.

43. During the 1978–1981 summer sales season, representatives were advised that the type of customer selected by the representative would affect his income because cancellations and serious delinquencies are related to customer quality. Representatives have been informed that selling in slums or outside the "market" of single working females would ultimately lead to poorer results.

44. During the summer sales seasons 1975–1981, AFS instructed its summer sales representatives to request the signature of a parental co-signer on the credit application of a single woman living at home with her parents. Representatives were so instructed without reference to the creditworthiness of the individual customer.

45. As of the summer of 1978 and continuing until the present, AFS sales representatives were advised that the actual commission on a sale to any single person living at home with her parents was $10 less if the contract did not have a parental co-signer (i.e., if it was an "S" sale rather than a "G" sale).

46. During the summer sales seasons 1975–1981, AFS instructed its summer sales representatives to request the signature of the spouse as a co-signer on the application of a married credit applicant. Representatives were so instructed without reference to the creditworthiness of the individual married credit applicant.

47. During the AFS summer sales seasons 1975–1981, sales representatives were informed that AFS had had excellent experience with sales to single non-minority females, 18–21, living at home with parents co-signing, and that these sales were AFS' primary market. Representatives were also informed that minority group members, married persons, persons living in low income housing projects, women living in apartments, and single women living at home whose parents did not co-sign the sales contract were less creditworthy and had worse payment records as groups than did single females in the primary market. Representatives were further advised that selling to other than the primary market could be detrimental to the sales representative's income. Sales to other than "G"

customers were to be avoided, if possible. Such information was disseminated through AFS publications, at AFS training centers, at meetings in AFS branch offices, and in conversations between AFS management and sales representatives.

48. During the summer sales seasons of 1975, 1976 and 1977, credit applicants coded as "G" (single, non-minority females, 18–21, living at home with parents co-signing) and "S" (single non-minority female living at home without parental co-signer) were automatically approved by AFS central office. Credit applicants coded as "M" (minority), "C" (married person), "P" (person living in low-income housing project), "A" (single female living in apartment), or "X" (Mexican, 1977 only) were credit-checked and then either accepted or rejected by AFS. In addition, persons over 21 were credit-checked.

49. During the summer sales season of 1978, credit applicants coded as "G", "S" and "C" were automatically approved by AFS central office. Credit applicants coded as "X" (including married persons other than the parent of a "G" sale and credit applicants over 21) were credit-checked and then either accepted or rejected by AFS.

50. During the summer sale seasons of 1979, 1980 and 1981:

(a) credit applicants coded as any of the following were automatically approved for credit by AFS:

| GC | SC | PC |
|----|----|----|
| GO | SO | PO |

(b) credit applicants coded as any of the following were credit-checked and then either approved or rejected by AFS:

| GM | SM | PM | AM | XC |
|----|----|----|----|----|
| | | | | XO |
| | | | | XM |

(c) credit applicants coded as AC or AO at certain time periods were handled as either (a) or (b) above.

51. During the 1979 and 1980 summer sales seasons, the following numbers/symbols on summer credit applications and/or in the AFS summer log signified the following about the application:

1. active
2. CWO (cash with order)
3. credit checked
4. return to office
5. cancel
6. reject
7. cancel (after three days)
* error in contract

52. AFS credit-checking process during the summer sales season generally consists of checking with a credit bureau and/or credit references and verifying employment.

53. In its evaluation of credit applicants subjected to a credit-check, AFS has no minimum income requirement, nor does AFS have a minimum length of employment requirement.

54. Once an applicant has been credit-checked, James Brown usually makes the determination of whether to accept or reject the applicant.

55. During AFS' winter sales season, AFS sells merchandise to students attending institutions of higher learning. The winter sales season is referred to as the American Prestige Series.

56. During the winter sales season there are no local branch offices but AFS sales personnel are located in the field in different parts of the United States.

57. Generally, winter sales personnel work full-time.

58. During the summer sales season, winter personnel work out of local branch offices as managers. Generally between 30–80 salespersons sell for AFS during the winter sales season.

59. New winter sales personnel are trained at training sessions. Training sessions are held in different parts of the United States.

60. Generally, Ed Satell and/or Marty Zeises conduct training sessions for new winter sales representatives. Winter sales personnel also attend AFS show directors meetings, regional sales meetings, leadership programs and other AFS-sponsored gatherings.

61. Sales representatives may schedule their own sales demonstrations by contacting students and asking them to host a "show", i.e., sales presentation, for their friends.

62. "Shows" in the American Prestige Series are also scheduled for sales representatives by employees in the AFS "booking room." The booking room is staffed by AFS employees who attempt to find persons to host sales demonstrations by calling college residences, e.g., dormitories and sorority houses. The booking room maintains a schedule of shows scheduled either by the booking room or by the sales representative.

63. Persons employed in the booking room ("bookers") are assigned each evening to a specific geographic area for which they are responsible; the task of a booker is to arrange sales demonstrations, or "shows", for the sales representative or representatives working within that geographic area.

64. Bookers are advised that use of a school directory often will permit them to identify the college year (class) of students.

65. Bookers are instructed that universities, four-year colleges, and nursing schools are excellent sources for booking shows.

66. Bookers are not given the names of two-year or junior colleges at which to book shows.

67. Before making telephone contacts, bookers have been instructed to refer to a document called the "no-call list" which identifies the school in each area where AFS does not wish to put on shows.

68. Bookers are instructed by AFS employees not to call black or predominantly black schools for scheduling sales demonstrations.

69. During the early to mid-1970s AFS winter sales personnel in the field were instructed to inform the booking room when they learned that a particular college was predominantly black. The booking room used this information in compiling a list of "no-call" schools.

70. From the 1974–75 winter sales season through the 1978–79 sales season, sales personnel were discouraged from booking shows with sophomores. Beginning with the 1979–80 sales season, sales personnel were no longer discouraged from booking shows with sophomores.

71. AFS receives approximately 2,500–10,000 credit applications during each winter sales season.

72. The average winter sale amount in 1980 was $700. (The summer average sale was approximately $800.)

73. Since at least the 1974–75 winter sales season and continuing through the current (1981–1982) winter season, AFS has had two types of sales relating to customer receipt of merchandise: immediate delivery sales and deferred delivery sales.

74. Customer payment terms, including finance charges assessed, are the same for immediate delivery and deferred delivery sales.

75. Interest is not charged for the balance of the school year following the signing of the sales contract by winter season purchasers. Thereafter, AFS charges interest on all sales to its customers on the amount of merchandise purchased at the rate permitted by law.

76. On an immediate delivery sale, the purchased merchandise is shipped to the customer as soon as the AFS verification process confirming the customer's address is complete. On a deferred delivery sale, the purchased merchandise is not shipped to the customer upon address verification but rather is shipped at some time in the future.

77. Since at least the 1974–75 winter sales season and continuing through the current (1981–1982) winter season, the AFS credit application has contained two boxes, one indicating immediate delivery of merchandise and the other indicating delivery of merchandise deferred until graduation. AFS winter sales personnel have been required to mark either the immediate or the deferred delivery box on the application after making a sale.

78. If deferred delivery customers write to AFS prior to receiving a notice of eligibility for shipment and request that mer-

chandise be shipped, AFS reviews the customers payment record. AFS ships the merchandise if the customers have established good payment records. Through the 1977–78 sales season, a deferred delivery customer who requested shipment of merchandise and who was approved for shipment after an AFS review, in some cases would be asked to increase her payment to $25 a month and to pay the finance charge commencing with the month after shipment of the merchandise. However, commencing with the 1978–79 sales season the $25 a month minimum was discontinued.

79. The length of time required for establishing a good payment record has varied. Through the 1978–79 sales season a good payment record was a minimum of 6–8 consecutive monthly payments. Since the 1978–79 sales season, AFS has considered three months of consecutive monthly payments indicative of a good payment record.

80. When putting on a sales demonstration to a "mixed show" defined as a show where the attendees include both customers to whom AFS chooses to sell on an immediate delivery basis and customers to whom AFS chooses to sell on a deferred delivery basis, AFS sales personnel have been advised to take aside the customers to whom AFS chooses to sell on a deferred delivery basis to ensure that these students are in fact sold to on a deferred basis.

81. AFS sales representatives have been advised that, in general, selling to minorities, freshmen and married students, could lead to adverse effects on the representative's income, particularly when done on an immediate delivery basis. The above information was disseminated to winter sales personnel through a variety of methods including AFS manuals, AFS winter training sessions, AFS sales meetings and in conversations between sales personnel and AFS management.

82. If a request is made for immediate shipment, AFS has routinely credit-checked applications received from married students during the winter sales season whereas applications from single students have been automatically approved.

83. In 1973–74, AFS' first winter sales season, AFS had a number coding system but no letter coding of contracts.

84. From at least the winter sales season of 1974–75 and continuing through the present, code letters have been printed on the AFS winter credit applications. The code letters refer to purchaser characteristics and have the following significance:

| Winter, 1974–75 | G = General (White single female) |
| 1975–76 | M = Black |
| | C = Couple |

| Winter, 1976–77 | G = General (White single female) |
| | M = Black |
| | C = Couple (Married) |
| | S = Hispanic |
| | O = Oriental |

| Winter, 1977–78 | G = General (White single female) |
| | M = Black |
| | C = Couple (Married) |
| | S = Hispanic |
| | O = Oriental |
| | X = Mexican |

| Winter, 1978–79 | G = General (White single female) |
| | M = Black |
| | C = Couple (Married) |
| | S = Hispanic |
| | O = Oriental |
| | X = Mexican |

85. The 1978–79 racial codes were in effect only for part of the sales season; for the other part of the season the racial code letters were on the contract but did not have any significance.

86. For the winter sales seasons, 1979–80, 1980–81, and 1981–82, the following codes were in effect:

*Two Codes*
Codes of Race and National Origin
 G = White
 M = Black
 O = Oriental
 X = Mexican or Spanish
Codes of Marital Status
 C = Married
 S = Not Married

87. Commencing with the winter sales season of 1976–77 and continuing until the present, the following code letters on the bottom of AFS winter credit applications signify the following:

Code Describing Educational Institution

R = Four-Year college

J = Junior College

N = Nursing School

V = Vocational School

88. Commencing with the winter sales season of 1979–80 and continuing until the present the following additional code letters on the AFS winter credit applications signify the following:

B = Not a Student

D = Student living in dorm

A = Student living in apartment

P = Student living with parents

89. From at least the winter of 1974–75 and continuing through the present winter sales season, AFS sales personnel have been required to code the sales contract in accordance with the characteristics of the particular customer and marking the applicable code letters. However, for part of the 1978–79 winter sales season sales personnel were asked to code only the customer characteristics relating to the type of school attended by the student.

90. If an uncoded contract is forwarded to AFS' central office, it is either returned to the sales representative for coding or the central office calls the representative to identify the appropriate code letters for the customer.

91. During the 1974–75 winter sales season, AFS sales personnel were advised to defer delivery of merchandise when selling to minorities and when selling to married students.

92. During the 1976–77 and 1977–78 winter sales seasons, AFS sales personnel were not allowed to offer immediate delivery of merchandise to any freshmen customers. All freshmen were to be sold to on a deferred delivery basis unless they could pass a creditworthiness test.

93. During the 1976–77 and 1977–78 winter sales seasons, AFS sales personnel were advised to defer delivery of merchandise when selling to minorities and when selling to married students.

94. AFS has advised its winter sales personnel to attempt to obtain a greater deposit amount when selling to minorities, freshmen and married students as compared to non-minority upperclassmen.

95. During the 1976–77 and 1977–78 winter sales seasons, AFS sales representatives were instructed to defer delivery on sales to all junior college students unless they could pass a creditworthiness test.

96. During all of the 1978–79 sales season, representatives were instructed to defer delivery on all freshmen, junior college student and vocational student sales unless they could pass a creditworthiness test.

97. During part of the 1978–79 sales season, representatives were advised to defer delivery of merchandise when selling to minorities and when selling to married students, but during another part of the sales season, representatives were not given such advice.

98. During the 1979–80, 1980–81 and 1981–82 winter sales seasons, AFS instructed its sales representatives to defer delivery of merchandise when selling to freshmen, junior college students and vocational school students unless they could pass a creditworthiness test.

99. During the same winter sales seasons, AFS encouraged its sales representatives to sell on a deferred delivery basis to black, Mexican and Spanish upperclassmen attending regular colleges or nursing schools.

100. During the same winter sales seasons, AFS discouraged its sales representatives from selling on a deferred delivery basis to white or Oriental upperclassmen attending regular colleges or nursing schools.

101. From the 1974–75 winter sales season and continuing until the present, the maximum deposit amount the sales representative may keep after making a sale is $20. As with the summer programs, this deposit is part of the representative's commission. Deposits over $20 must be turned in to AFS.

102. During the 1974–75 winter sales season a "regular sale" was an immediate

delivery sale to a non-minority single junior or senior. Commission was paid for regular sales at the representative's next pay period. On all other sales the computer was programmed to notify AFS when the customer had made the amount of payments necessary to allow payment of commission.

103. If a customer ceased making payments prior to paying 50% of the original sale amount plus the interest charges assessed until that time, the actual commission received was charged back to the sales representative.

104. Guaranteed income was paid to a representative who put on a minimum of 20 sales shows attended by a minimum of ten juniors or seniors per show.

105. Bonuses were paid to representatives based on net sales amounts.

106. During the 1977–1978 winter season, compensation rules included the following:

(a) Commission

(1) For sales to non-minority single sophomores, juniors and seniors on an immediate delivery basis, commission was paid immediately (*i.e.,* on satisfactory completion of the verification process).

(2) For sales to minority students, married students, freshmen, junior college students and on all deferred delivery sales.

If the purchaser made payments of $10 (not including the deposit) within 90 days of the date the first payment was due and was not more than 29 days delinquent at that time, then the commission was:

| SALE AMOUNT | MERCHANDISE | COMPANY BOOKED | PERSONALLY BOOKED | Deposits already kept by representatives were subtracted from the commission payment. |
|---|---|---|---|---|
| $500 | package sale | $40 | $65 | |
| 370 | cookware | 40 | 58.50 | |
| 400 | china | 30 | 50 | |
| 200 | china | 15 | 25 | |
| other | other | 10% | 15% | |

If the purchaser did not make payments as shown above then one half the above commission would be paid after the account was paid in full.

(b) A "regular sale" was an immediate delivery sale to a non-minority sophomore, junior or senior (excluding junior college students). Commission was paid on regular sales at the representative's next pay period. On all other sales the computer was programmed to notify AFS when the customer had made the amount of payments necessary to allow payment of commission.

(c) Chargebacks—If a customer ceased making payments prior to paying 50% of the original sale amount plus interest charges assessed until that time, the actual commission received by the sales representative was charged back to him if the sales representative was still working for the company.

107. During the 1976–1977 and 1977–1978 winter sales seasons AFS had a quality bonus system. A quality bonus was paid to representatives on immediate delivery customers who had made their beginning payments on time. If at least 70% of the representatives immediate delivery customers made their first and second payments on time the representative received a bonus amount. The schedule was as follows:

| % of 1st and 2nd payments made on time | Amount of Bonus |
|---|---|
| 70% | 3% of sales |
| 80% | 4% of sales |
| 90% | 5% of sales |

108. In 1976–77 and 1977–78, no quality bonus was awarded on deferred delivery sales, nor was a quality bonus awarded if fewer than 70% of the representative's immediate delivery sales customers made their first and second payments on time.

109. The purpose of the establishment of the quality bonus system was to encourage representatives to sell only to "quality" customers. At training sessions representatives were informed that non-minority upperclassmen were "quality" customers.

110. During the 1976–1977 and 1977–1978 winter sales season, sales representative were informed that "G"-type immediate delivery accounts (*i.e.*, non-minority, single sophomores, juniors and seniors) should be the largest percentage of their sales.

111. For the 1978–79 winter sales season, commission compensation rules for sales representatives included the following:

(a) On immediate delivery sales to upperclassmen, full commission was paid to a representative upon AFS' completion of the verification process.

(b) On all deferred delivery sales the commission was not paid to a representative until the customer made the first payment when due and then only if the account was not more than 29 days delinquent. If the customer did not fulfill the above terms, the commission was payable to personnel at one half the rate when the account was paid in full if the sales representative was still employed by the company.

(c) If a customer defaulted in payments prior to having paid in 50% of the original sales amount plus interest charges assessed up to that time, the commission advanced to the representative was charged back to him if the sales representative was still employed by the company.

(d) Commission was approved for payment at the representative's next pay period if the sale was a regular sale. *See* 106(b) *supra.* If the sale was not a regular sale, commission was paid when the customer had made the amount of payments necessary to allow payment of commission.

112. AFS compensation for sales representatives during the 1981–82 winter sales season is partially based on a figure referred to as the net volume credit amount. The net volume credit, computed based on the amount of a particular sale, is higher for an immediate delivery sale than for a deferred delivery sale.

113. Individual payroll records for winter sales personnel indicate whether each sale was an immediate delivery, or a deferred delivery sale.

114. After making a sale, winter sales personnel forward the credit application to AFS' central office where they are logged in by central office personnel.

115. As AFS winter sales contracts arrive at AFS central office, AFS personnel determine which "office" the student purchaser belongs to, assign the student purchaser an office-order number, and an order number peculiar to the purchaser. AFS personnel also record the sales contract into the AFS log by office for the winter sales season. In addition, each contract is given another number, known as the customer and/or contract number.

116. AFS obtains financing from outside sources either by using sales contracts as collateral or by selling sales contracts; the terms of the financing are more favorable for AFS on contracts where the merchandise has already been received by the customer. One source of AFS' financing purchases only the contracts where delivery to the customer has been made; the same source of financing limits AFS to borrowing against the deferred delivery contracts.

117. AFS has had difficulty using deferred delivery contracts as collateral for financing, and receives less favorable financing terms where deferred delivery contracts are used as collateral.

118. In the 1975–76 winter sales season, AFS was unable to obtain any major financing of contracts sold on a deferred delivery basis, and during that season the substantial majority of sales were made on an immediate shipment basis.

119. During the 1977 summer sales season, applications from black persons were marked with an asterisk; when those applicants whose applications were marked with an asterisk called the office to inquire about their possible employment, they were told that all the jobs had been filled; the applications so marked were subsequently thrown away.

120. AFS' personnel with recruitment and hiring responsibilities are informed that the hiring of black persons should be avoided because:

(a) "Black" persons will have difficulty in abiding by AFS' policies concerning coding of contracts and the terms and conditions upon which credit is granted, and in accepting the criteria by which credit applicants are evaluated."

(b) "Black customers are bad credit risks since they frequently cancel the sales order or don't pay their monthly installment payments. Blacks tend to sell primarily to black persons, are not received well at the door by white persons, and generally have difficulty selling in white neighborhoods."

(c) "It is not fair to a black person to hire him since he or she will not do well because he or she sells to blacks."

(d) "AFS invests in summer employees by training them and giving them samples. AFS can't afford to invest in someone who will not make it."

121. There is undisputed testimony that over the years AFS has hired over 250 minorities for its summer sales positions and that AFS officials were committed to promoting all qualified sales representatives within the AFS management team.

122. There is substantial evidence that Satell was personally committed to racial equality in hiring. However, there is also evidence that some of AFS' field managers and agents discriminated against black applicants without the knowledge or consent of Satell.