UNITED STATES of America, Appellee,

v.

AMERICAN FUTURE SYSTEMS, INC., First National Acceptance Corporation and Edward M. Satell, President of American Future Systems, Inc., Appellants.

No. 83–1766.

United States Court of Appeals,
Third Circuit.

Argued June 18, 1984.

Decided Sept. 5, 1984.

Rehearing Denied Oct. 2, 1984.

As Amended Oct. 10, 1984.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This case involves an appeal from a district court order finding that Appellants, American Future Systems, Inc., ("AFS"), First National Acceptance Corporation ("FNAC"), and Edward M. Satell ("Satell"), President of American Future Systems, Inc., violated the anti-discrimination provisions of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.* (1982).

Appellants argue that the district court erred as a matter of law in finding that appellant violated the ECOA by treating minorities, males and married persons less favorably than single white females in their credit programs. Appellants also challenge the breadth of the district court's order enjoining AFS's marketing and hiring practices. Finally, appellants FNAC and Satell argue that the district court erred as a matter of law in finding them to be creditors and therefore subject to the terms of the ECOA.

We will affirm the district court's order finding that AFS, FNAC and Satell are creditors who violated the ECOA by discriminating against credit applicants based on prohibited criteria such as race, sex and marital status. We also will affirm the district court's order concerning AFS's business practices because the order is tailored to ensure that AFS does not continue its illegal practice of discriminating on the basis of race, sex and marital status in the extension of credit.

Henry T. Reath (argued), Alison R. Lazerwitz, Duane, Morris & Heckscher, Philadelphia, Pa., for appellants.

Edward S.G. Dennis, Jr., U.S. Atty., Philadelphia, Pa., William Bradford Reynolds, Asst. Atty. Gen., Charles Justin Cooper, Deputy Asst. Atty. Gen., Jessica Dunsay Silver, Dennis J. Dimsey (argued), Attys., Dept. of Justice, Washington, D.C., for appellee.

Before ALDISERT, Chief Judge, and HIGGINBOTHAM and ROSENN, Circuit Judges.

I.

The parties have not challenged the district court's extensive factual findings as modified upon determination of AFS's Motion for Reconsideration. Thus, these factual findings of the district court are accepted as correct.

American Future Systems, Inc. sells china, cookware, crystal and tableware, and AFS extends credit to its customers. Since its incorporation, AFS's sales on a credit

basis have amounted to over 95% of its total sales.

First National Acceptance Corporation is a wholly owned subsidiary of AFS. FNAC handles the billing and collection for credit sales contracts initiated by AFS.

Edward M. Satell has been president, chief executive officer and principal shareholder of AFS since its incorporation in 1973. Satell is also an officer of FNAC. Satell helped establish AFS's credit policies. Moreover, Satell regularly participates in decisions to extend or to decline credit to classes of AFS's credit applicants. In addition, Satell regularly takes part in decisions concerning the terms and conditions upon which credit is granted. He also participates in establishing the criteria for evaluating credit applicants.

AFS alleges that its customary credit standards require the credit applicant to satisfy a three-part test: 1) a telephone in the residence; 2) positive credit experience of at least $100; and 3) employment with regular income. Although the district court made no finding in this regard, for purposes of this appeal we will assume that appellants' assertion is true.

The district court found that "AFS is unique in the credit field because it is successful in extending credit to young people who would otherwise be unable to obtain credit in the traditional market place." *United States v. American Future Systems, Inc.*, 571 F.Supp. 551, 554 ¶ 28(a) (E.D.Pa.1983). "AFS programs have a social utility in that they afford young people, including minorities, an opportunity to obtain credit despite their youth and lack of prior credit history." *Id.* at 554 ¶ 28(b).

"AFS has a laudable objective of providing credit to the maximum extent possible consistent with its ability to make a profit and to expand credit to young people based on AFS's general operating experience." *Id.* at 554 ¶ 28(c).

AFS markets its goods through three separate programs: (1) a summer program;

(2) a winter program for single white females; and (3) a winter program for minorities, married persons and males.[1]

### A. Summer Program.

AFS's preferred sales target in this program has always been the group of single white females between the ages of 18 and 21 living at home with a parent who could co-sign for the credit extension. Although requested, the parent of the single white female need not co-sign in order for credit to be extended. AFS automatically ships the goods to the applicants in this group without checking the credit of the single white female applicant or the parent(s), if the parent(s) co-signed.

The district court explained how AFS reached its preferred market of 18 to 21 year old single white females:

> [AFS] has encouraged sales to this preferred group by adoption of a policy (by specific directions to its sales force), to sell in areas believed to be all white, or predominantly white, and by avoiding sales areas where the minority population might be substantial. It has discouraged sales personnel to pursue minority or non-preferred groups through deferred commission arrangements on such sales which arrangements are markedly different from, and substantially less lucrative than, the immediate full commission arrangements for sales to the preferred market group of white single females between the ages of 18 and 21.

*Id.* at 555 ¶ 33.

The district court pointed out further:

> The non-preferred sales, which are to almost all black females, are explained by mostly unavoidable encounters of salespersons with black or other minority persons as part of "mixed audiences" in markets targeted by AFS as "all white colleges," "all white neighborhoods" and "all white high schools."

*Id.* at 555 ¶ 34.

Where sales presentations are made to persons outside the preferred single white

---

1. This program covered anyone between the ages of 18 and 21 who was not a single white female in her sophomore, junior or senior year in college or nursing school.

female group, goods are shipped on a deferred basis, following among other things a satisfactory credit check made on both the applicant and co-signer. About 20% of the persons in this non-preferred category fail to qualify for credit under AFS's alleged customary credit standards. Although, where possible, AFS avoids making sales to black and other minority persons, there is no evidence that AFS has expressly refused to sell its product on a cash basis to an individual solely based on factors such as race, sex, or marital status. However, if an applicant fails the credit check, credit is not extended. If credit is the only method by which an applicant can purchase, then no sale is made. This result cannot occur with the single white female group because there is no credit check of anyone in that group.

Parents of applicants in the non-preferred group are strongly encouraged to co-sign when the sale is based on their credit standing. Furthermore, a large deposit is encouraged on non-preferred program sales, although the minimum applicable to all sales will be accepted.

B. *Winter Programs.*

AFS alleges that it has two separate winter programs. One program comprises only single white females who are upperclasspersons (sophomores, juniors and seniors) in a four-year college or nursing school. The district court found this to be the preferred program. The other program comprises minorities, males and married persons attending college or vocational school; the district court found this to be the non-preferred program.[2]

The applicants for the preferred winter credit program for single white females "are treated as preferred sales targets, regardless of age, prior credit histories, or any other normal indicia of creditworthiness." *Id.* at 556 ¶ 42. They receive immediate credit. "Sales to this group are always made on an immediate shipment basis *unless* there is a specific request for a

delay in shipment." *Id.* at 556 ¶ 42 (emphasis added).

The non-preferred winter credit program comprises all minorities, males, married persons and freshmen in four-year colleges as well as students in junior colleges and vocational schools. This group receives their goods on a deferred shipment basis. Unlike the preferred winter credit program, the non-preferred credit program withholds the shipment of goods to its credit applicants until the applicant makes three successive monthly payments. If non-preferred applicants fail to make three consecutive monthly payments, AFS retains the payments made and retains the goods earmarked for shipment.

Both winter programs are designed to meet the "special social need" for credit shared by 18 to 21 year olds. The distinction between the two programs—based on race, sex and marital status—is not, however, a matter of differential "social need." Rather, it stems from a marketing judgment made by AFS. AFS does not inform potential credit applicants that they are participants in an alleged special purpose credit program. As the district court noted, "[a]ll applicants between 18–21 are carefully led to believe that they are being treated the same as all other applicants." *Id.* at 557 ¶ 55.

Potential credit applicants who fall into the non-preferred category because of their race, sex or marital status are therefore unable to decline credit offered through an alleged special purpose credit program. *Id.* at 557 ¶ 57. Moreover, these same non-preferred credit applicants are not told "that they are being rejected for the credit terms extended to other persons identically situated, except for the characteristics of race, sex, marital status, or year in school." *Id.* at 558 ¶ 58.

The district court also found that AFS attempts to justify its credit extension distinctions with sales and account currency

---

**2.** If a student is not a single white female upperclassperson, this student is automatically relegated to the non-preferred program.

statistics, generated by its predecessor company American Foresight, that purport to show that minority customers are, as a group, less creditworthy than their white counterparts. The district court credited the testimony of Dr. Bernard Siskin, a statistical expert for the Government, that "the AFS data system and analyses are statistically biased and, therefore, statistically unreliable, because it was the AFS sales policy to discourage sales to the class of minority persons or other non-preferred groups between the ages of 18–21 while encouraging sales to the preferred market group." *Id.* at 559 ¶ 76. Moreover, AFS's statistical analyses did not account for salespersons' intentional miscoding of sales to blacks as sales to whites so as to obtain better commissions. *Id.* at 558 ¶ 67.

Based on these findings the district court held that AFS, FNAC and Satell are creditors who violated the anti-discrimination provisions of the ECOA.

Appellants do not appeal the district court's conclusion that AFS's summer program discriminated on the basis of race, sex and marital status in violation of the ECOA. Thus, we will restrict our review to the two winter credit programs that the district court also found to have violated the ECOA by discriminating on the basis of race, sex and marital status in the extension of credit.

## II.

■ The Equal Credit Opportunity Act proscribes discrimination in the extension of credit. Section 1691(a) of the ECOA states that

[i]t shall be unlawful for any creditor [3] to discriminate against any applicant, with respect to any aspect of a credit transaction—(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract).[4]

The ECOA does provide, however, for special purpose credit programs responsive to special social needs of a class of persons. Section 1691(c)(3) carves out this exception:

It is not a violation of this section for a creditor to refuse to extend credit offered pursuant to ... any special purpose credit program offered by a profit-making organization to meet special social needs which meets standards prescribed in regulations by the [Federal Reserve] Board.

The legislative history of this exception throws much light on its meaning. The Joint Conference Committee on the 1976 amendments explained the intent of special purpose credit programs and the circumstances under which special purpose programs would be permitted.

The intent of [the special purpose credit program language] of the statute is to authorize the [Federal Reserve] Board to specify standards for the exemption of classes of transactions when it has been clearly demonstrated on the public record that *without such exemption the consumers involved would effectively be denied credit.*

As in the case of Government sponsored or non-profit programs, *this provision is intended to confirm that ongoing special programs offered by com-*

---

3. Appellants FNAC and Satell contend that the district court erred in finding that they were "creditors" under the ECOA. 15 U.S.C. § 1691a(e) defines a creditor as "any person who regularly extends, renews or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." For the reasons set out in the district court's opinion, 571 F.Supp. at 561, we agree that FNAC and Satell are creditors under the ECOA.

4. The ECOA was originally passed in 1974 to prohibit credit discrimination on the grounds of sex and marital status. The Act was amended in 1976 to prohibit as well credit discrimination on the basis of race, color, religion, national origin and age. 15 U.S.C. § 1691(a)(1). The 1976 Amendments also included the exemption for special purpose credit programs. 15 U.S.C. § 1691(c)(3).

*mercial creditors are not automatically violative of this Act.*

H.R.Rep. No. 873, 94th Cong., 2d Sess. 8, *reprinted in* 1976 *U.S.Code Cong. & Ad. News* 403, 428 (emphasis added). However, this exemption is not without limitation.

The Senate Committee on Banking, Housing and Urban Affairs also expressed concern about the ECOA being read to discourage ongoing credit programs designed to address "special social needs." The Senate Report stated:

> Certain credit programs are specifically designed to prefer members of economically disadvantaged classes, and the Committee does not intend to undermine these programs ....
>
> ....
>
> In addition, subsection 701(c)(3) authorizes the Board to prescribe standards for other special purpose programs offered by profit-making organizations (commercial creditors) which will likewise be immune from a charge that they violate the Act. By its reference to "special social needs" the Committee expects that the minimum requirement for any such program will be that it is designed to increase access to the credit market by persons previously foreclosed from it.

S.Rep. No. 589, 94th Cong., 2d Sess. 7, *reprinted in* 1976 *U.S.Code Cong. & Ad. News* 403, 409.

The Chairperson of the House Subcommittee responsible for the language contained in § 1691(c)(3) explained further the reason for the special purpose credit program exemption and gave examples of contemplated programs:

> [w]hen we wrote 701(c)(3) in the Subcommittee last year, we definitely had in mind programs offered by banks and other profitmaking organizations to extend credit to *young* people, or to *old* people, or to *minority* groups, but we did want firm standards to be set. In fact, as we wrote it last year, we proposed that every such plan should have *specific* Board approval *or* meet standards prescribed by the Board, so that this provision would not become a loop-

hole for invidious actions against any *other* group of creditworthy consumers.

121 Cong.Rec. 27, 138 (1975) (emphasis in original).

The Senate Subcommittee also gave examples of the sort of special purpose credit programs that were contemplated by this exemption.

> The essential prohibition in this legislation is directed at discrimination "against" applicants. *Nothing in this section should be read to bar ...* experimental or ongoing special programs which prefer applicants in certain categories so long as there is no accompanying restriction of credit available to applicants not in those categories. *For example, this Act is not intended to prohibit positive credit programs aimed at the "young adults" or "golden age" accounts.*

S.Rep. No. 589, 94th Cong., 2d Sess. 5–6, *reprinted in* 1976 *U.S.Code Cong. & Ad. News* 403, 407 (emphasis added).

The Federal Reserve Board limits the special purpose credit program exception in Regulation B, which states that a program:

> shall qualify as a special purpose credit program under paragraph (a) of this section *only* if it was established and is administered so as not to *discriminate against an applicant* on the basis of race, color, religion, national origin, sex, marital status, age ..., [or] income derived from a public assistance program, ... except that all program participants may be required to share one or more of those characteristics so long as the program was not established and is not administered with the purpose of evading the requirements of the Act or this part.

12 C.F.R. § 202.8(b)(2) (1984) (emphasis added).

■ Having found that AFS differentiates in its treatment of credit applicants based on race, sex, and marital status and having established that the ECOA permits special purpose credit programs to so differentiate under certain circumstances in order to *enhance* the credit opportunities

of disadvantaged groups, we will now consider whether AFS's credit programs satisfy the requirements of special purpose credit programs under the ECOA.

The ECOA sets forth general guidelines which must be satisfied in order for a credit program to qualify as "special" under the Act. A special purpose credit program must "meet special social needs," 12 C.F.R. § 202.8(a)(3) (1984); a program meets this requirement when it is

> established and administered to extend credit to a class of persons who, ... (under the credit agencies' customary standards) probably would not receive such credit or probably would receive it on less favorable terms.

12 C.F.R. § 202.8(a)(3)(ii).

The district court made a finding which shows that the class of persons between the ages of 18 and 21 are in special need of credit assistance. The court stated:

> Nationally, all youths between the ages of 18 to 21 who are not regularly employed and who have not had prior credit experience are considered to be less than creditworthy and cannot obtain credit without a parental co-signer who is creditworthy. This is so regardless of race, color, marital status, or year in school. Because one of the purposes of the ECOA is to promote equal and non-discriminatory access to credit opportunity in a credit oriented society, extension of credit by a profit-making organization to persons otherwise disabled credit-wise, could constitute meeting a special social need through a special purpose credit program.

571 F.Supp. at 560 ¶ 81.

In this case there is no dispute that we are concerned with the special requirements for eligibility under § 202.8(a)(3). The first pertinent requirement under § 202.8(a)(3) is that the "special purpose credit program [is] offered by a for-profit organization or in which such an organization participates to meet special social needs." In the case before us AFS is a for-profit organization which alleged that it operated three separate special purpose

credit programs. The district court made a finding of fact that while AFS purported to have three special purpose credit programs, AFS identified only one special need. The district court defined that need as "the extension of credit to the class of youth between the ages of 18 and 21 excluded from the customary credit market due to the lack of prior credit experience." 571 F.Supp. at 561.

Section 202.8(a) provides that once the requirements necessary to address the particular social need are set, persons not within the special social need category may be excluded from participation in the particular credit program. It states:

> the Act and this part are not violated if a creditor refuses to extend credit to the applicant solely because the applicant does not qualify under the special requirements that define eligibility for the following types of special purpose credit programs.

12 C.F.R. § 202.8(a).

Thus, there is no question that AFS could have excluded persons not between the ages of 18 and 21. The dispute in this case concerns the AFS credit programs that treated applicants differently based on race, sex and marital status within a special need category defined only on the basis of age. The district court held that AFS could offer only one special purpose credit program because AFS identified only one special social need. 571 F.Supp. at 563. AFS argues that this conclusion is in error because the ECOA does not limit creditors in the number of credit programs they can employ to address a social need. Thus, we consider whether the ECOA prohibits an employer from having several special purpose credit programs responding to but one social need; that is, designed to address the social need of age but which do not differentiate on other prohibited bases such as race, sex or marital status.

We believe that the district court erred in its broad determination that in order to have more than one special purpose credit program, a creditor must identify more

than one special social need. In combing the ECOA and its legislative history, we could find no language to support the district court's holding on this issue, nor do we believe that the ECOA should be so interpreted. We believe that once a social need category such as age has been established and all class members having that need have been defined, a creditor may institute more than one program to address that need; this is true so long as other prohibited factors not inextricably tied to the defined need are not used as a basis for differentiating the treatment of individuals.

For example, AFS could implement a winter credit program and a summer credit program provided both were designed to address the same social need of extending credit to young persons between the ages of 18 and 21 excluded from the customary credit market and provided neither differentiated its treatment of customers based on factors such as race, sex or marital status. In this case, these factors are simply not inextricably tied to the social need category of age in this case. In our view the mere existence of two special purpose credit programs (winter and summer) designed to respond to that same social need would not violate the ECOA.

■ The second requirement under § 202.8(a)(3) is that the special purpose credit program be set out in writing.[5] The complaint in this case was filed in May 1978. Yet, the district court made a finding of fact that "[p]rior to the 1979 summer sales season, AFS had no credit program formally described in writing or designated as a 'special purpose credit program.'" 571 F.Supp. at 555 ¶ 30. We believe this is a sufficient basis for finding a violation of the ECOA. Moreover, the district court found that credit applicants were not told they were participating in a special purpose credit program. It stated that "[a]ll applicants between 18–21 are carefully led to believe that they are being treated the same as all other applicants." *Id.* at 557 ¶ 55.

Even assuming AFS satisfied the written requirement of § 202.8(a)(3)(i), AFS's credit programs fail to satisfy the third requirement for special purpose credit programs. The third requirement of § 202.8(a)(3) is that

[t]he program is established and administered to extend credit to a class of persons who, pursuant to the customary standards of creditworthiness used by the organization extending the credit, either probably would not receive such credit or probably would receive it on less favorable terms than are ordinarily available to other applicants applying to the organization for a similar type and amount of credit.

12 C.F.R. 202.8(a)(3)(ii).

The district court held that AFS's credit programs for non-preferred applicants violated the ECOA because "the credit extension terms for ... [non-preferred credit applicants] must be no less favorable than credit given to defendants' primary credit applicants to whom credit is ordinarily available for similar types and amounts." 571 F.Supp. at 562. In addition, the district court declared that "so long as the protected group is assigned less favorable credit terms than others, there is unlawful discrimination whether disguised or well-intended." *Id.* at 562–63.

■ We believe that the district court erred in analyzing the requirements of § 202.8(a)(3)(ii) in this manner. The requirements of this section are framed in disjunctive terms. A credit program satisfies its requirements if the credit applicants either "would not receive such credit" *or* "probably would receive it on less favorable terms than are ordinarily available to other applicants applying to the organization for a similar type and amount of credit." 12 C.F.R. § 202.8(a)(3)(ii).

---

**5.** The special purpose credit program must be "established and administered pursuant to a written plan that (A) identifies the class or classes of persons that the program is designed to benefit and (B) sets forth the procedures and standards for extending credit pursuant to the program." 12 C.F.R. § 202.8(a)(3)(i).

In this case the district court earlier found that AFS's programs were designed to *extend* "credit to the class of youth between the ages of 18 and 21 excluded from the customary credit market." 571 F.Supp. at 561. Thus, if AFS offered credit to the class of persons between the ages of 18 and 21 who but for the alleged special purpose credit program would not receive credit, then the alleged special purpose program satisfies the requirements of § 202.-8(a)(3)(ii).

AFS could also, for example, satisfy § 208.8(a)(3)(ii) if its winter program (1) treated all persons 18 to 21 years old identically, *i.e.*, with no distinctions based on race, sex or marital status; (2) extended credit to this class even though under AFS's customary credit standards its customers would not receive credit; but (3) charged special purpose program participants higher credit terms than persons participating in AFS's customary credit program. Charging special purpose credit program participants higher terms than customary credit program participants is not in and of itself fatal.[6]

Notwithstanding a credit program having satisfied these three requirements of § 202.8(a)(3), a program once established cannot discriminate on prohibited bases such as race, sex or marital status. Regulation B sets forth this limitation. It states that a program

> shall qualify as a special purpose credit program under paragraph (a) of this section *only* if it was established and is administered so as not to *discriminate*

*against an applicant* on the basis of race, color, religion, national origin, sex, marital status, age ..., [or] income derived from a public assistance program, ... except that all program participants may be required to share one or more of those characteristics so long as the program was not established and is not administered with the purpose of evading the requirements of the Act or this part.

12 C.F.R. § 202.8(b)(2) (emphasis added).

Congressman Annunzio, who recommended key amendments which broadened the types of discrimination prohibited by the ECOA, elaborated on the purpose of the ECOA:

> The essential concept of nondiscrimination in the extension of credit is that each individual has a right when he applies for credit, to be evaluated as an individual: to be evaluated on his individual creditworthiness, rather than based on some generalization or stereotype about people who are similar to him in race, color, national origin, religion, age, sex or marital status. *Bias is not creditworthiness. Impression is not creditworthiness. An individual's ability and willingness to repay an extension of credit is creditworthiness.*

121 Cong.Rec. 16,740 (1975) (emphasis added).

The ECOA defines "discriminate" as follows: "*Discriminate against an applicant* means to treat an applicant less favorably than other applicants." 12 C.F.R. § 202.2(n) (1984). Thus, we must decide

---

6. We believe that if a class of persons is identified and selected to participate in a special purpose credit program and that class of persons would qualify for credit under a creditor's customary standards of credit, then the portion of 12 C.F.R. § 202.8(a)(3)(ii) concerning the terms of the credit extension becomes implicated. In that situation we believe that so long as the special credit terms offered to that class of persons are more favorable than the terms that class otherwise would receive under a creditor's customary credit terms, the special credit purpose credit program does not necessarily violate the ECOA.

We recognize that a creditor under its customary standards of credit might have varying degrees of preferred customers. We do not read § 202.8(a)(3)(ii) to require a creditor to extend its special purpose credit program participants more favorable credit terms than each and every customer who satisfies the company's customary credit standards. It is sufficient that the terms offered special purpose credit program participants are better than the terms they would have received but for their participation in the special purpose credit program. Of course, the creditor may not differentiate its treatment of persons within the defined special need category of age on the basis of other prohibited factors, i.e. race, sex or marital status, not inextricably tied to the need being addressed.

whether AFS's alleged special purpose credit programs differentiate among applicants in an impermissible manner.

AFS readily admits that it treats participants in its alleged two winter credit programs, members of the class of persons between the ages of 18 and 21, differently on the basis of race, sex and marital status. According to AFS its winter program offers two separate special purpose credit programs: first, a credit program for single white females who are sophomores, juniors or seniors at either a four-year college or a nursing school and second, a program for all minorities, married persons, males, college freshmen and all students who attend junior or vocational schools.

The district court found the single white female group to be AFS's preferred marketing group. These females receive immediate credit and immediate shipment of goods. The district court found the group of minorities, married persons, males, freshmen and all students attending junior or vocational schools to be AFS's non-preferred group. Members of this group must make three consecutive payments before they receive their goods.

The district court stated:

[o]n an immediate delivery sale, the purchased merchandise is shipped to the customer as soon as the AFS verification process confirming the customer's address is complete. On a deferred delivery sale, the purchased merchandise is not shipped to the customer upon address verification but rather is shipped at some time in the future.

571 F.Supp. at 571 ¶ 76.

Participants in AFS's non-preferred credit program will *not* receive their merchandise as soon as their address is verified, nor are they permitted under ordinary circumstances to defer payment of their debt.[7] They must make three consecutive monthly payments before their goods are shipped.

Moreover, as the district court stated in its findings of fact, "[o]n all defaulted deferred shipment accounts AFS not only retains the merchandise, but also retains any deposits and payments made on accounts." *Id.* at 555–56. Thus, the district court concluded that within the group of persons between the ages of 18 and 21 the credit terms offered to minorities, males and married persons were less favorable than the credit terms offered to single white females.

Thus the specific issue before us is whether the ECOA permits such differential treatment where the district court expressly found that each person in the group of individuals between the ages of 18 and 21 shares the same credit disability. That is, once the social need is defined only as extending credit to a particular age group, can a creditor use factors such as race, sex and marital status in setting up special purpose credit programs designed to address that social need when such factors are not related to the need? Although special program "participants may be required to share one or more of those characteristics" ordinarily considered prohibited bases, 12 C.F.R. § 202.8(b)(2), we believe they may be required to share only those factors inextricably tied to the need being addressed.

It is precisely for this reason that Regulation B states that a program may be considered a special purpose credit program "only if it was established and is administered so as not to discriminate against an applicant on the basis of race, color, religion, national origin, sex, marital status, [or] age ... *except* that all program participants may be required to share one or more of those characteristics so long as the program was not established and is not administered with the purpose of evading the requirements of the Act or this part." § 202.8(b)(2).

---

7. If an applicant insists on immediate shipment, AFS will grant that request. However, since AFS does not tell minorities or other non-preferred group members that their credit terms are different because of race, sex or marital status, they are not told that, if they demand it, they have a choice of immediate or deferred shipment.

The explanatory notes to the 1977 revision of Regulation B, § 202.8(b)(2), point out that

> once the characteristics of the class of beneficiaries are established, a creditor may not discriminate among potential beneficiaries on a prohibited basis. For example, a creditor might establish a credit program for impoverished American Indians. If the program met the requirements of § 202.8(a), the creditor could refuse credit to non-Indians *but could not discriminate among Indian applicants on the basis of sex or marital status.*

42 Fed.Reg. 1248 (1977) (emphasis added).

This example closely parallels the pertinent facts of this case. Here the social need is defined as extending credit to persons between the ages of 18 and 21 excluded from the customary credit market. The sole otherwise prohibited factor used in defining that need is age. Thus, a creditor could refuse to extend credit to persons based on the otherwise prohibited basis of age. However, just as the explanatory note example prohibits discrimination among American Indian applicants on the basis of sex or marital status in a credit program for impoverished American Indians, so too should AFS be prohibited from discriminating on the basis of race, sex or marital status in a credit program designed to extend credit to the group of persons between the ages of 18 and 21.

■ In this case, AFS identified one broad class of persons excluded from the customary credit market: the 18 to 21 year old age group. The district court found that each person in this age group irrespective of race, sex or marital status shared the same credit disability. In our view, where each person in the class shares the same special need but does not receive the same credit terms solely because of the individual's sex, race or marital status the program in question violates the ECOA.

The significance of AFS's discrimination on the basis of race can be illustrated by the following hypothetical and with a brief historical perspective of gender discrimination. Assume AFS had two prospective customers, Sarah and Jane, both were juniors attending the same university. Assume further that Sarah and Jane both earned the same level of income and both shared the same credit disability and that credit disability was their age category. Assume finally that Sarah was different from Jane in only one respect. Sarah was white, and Jane was black. Based on this difference alone, under AFS winter credit program, Sarah would receive immediate credit and immediate shipment of goods. Jane, on the other hand, would not receive immediate credit. First, she would be required to make three consecutive monthly payments; only then would she be entitled to credit as demonstrated by AFS's shipment of goods to her. In differentiating its treatment of Sarah and Jane based on race in this situation, AFS discriminates on a prohibited factor such as race which is not inextricably tied to the social need being addressed—age. Thus, AFS breaches the cardinal commandment of the ECOA, of which Congressman Annunzio spoke. He stated:

> The essential concept of nondiscrimination in the extension of credit is that each individual has a right when he applies for credit to be evaluated as an individual: to be evaluated on his individual creditworthiness, rather than based on some generalization or stereotype about people who are similar to him in race, color, national origin, religion, age, sex, or marital status.

121 Cong.Rec. 16, 740 (1975).

As the district court correctly noted, [s]uch distinctions are not responsive and remedial of a special social need of the disadvantaged but relate solely to defendants' conscious marketing decision to maximize profits by excluding, or severely restricting, the socially disadvantaged from its credit market. 571 F.Supp. at 561–62.

There is a particular irony in AFS's approach where it singles out white women as a "disadvantaged" group and gives them a special advantage that it unhesitat-

ingly denies to black and other minority women. Certainly we recognize that this country has a tragic history in gender discrimination in that women have not been, and still today are often not, treated as equals. As Professor Herma Kay notes in her magnificent treatise, *Sex-Based Discrimination:*

> The notion that men and women stand as equals before the law was not the original understanding. Thomas Jefferson put it this way:
>
> > Were our state a pure democracy there would still be excluded from our deliberations women, who, to prevent depravation of morals and ambiguity of issues, should not mix promiscuously in gatherings of men.
>
> Alexis de Tocqueville, some years later, included this observation among his commentaries on life in the young United States:
>
> > In no country has such constant care been taken as in America to trace two clearly distinct lines of action for the two sexes, and to make them keep pace one with the other, but in two pathways which are always different. American women never manage the outward concerns of the family, or conduct a business, or take a part in political life.
>
> During the long debate over women's suffrage the prevailing view of the natural subordination of women to men was rehearsed frequently in the press and in legislative chambers.
>
> ....
>
> For more than a century after the adoption of the fourteenth amendment, the judiciary, with rare exceptions, demonstrated utmost deference to sex lines drawn by the legislature.

**8.** For an analysis of the disparities regarding race, *see generally* Derrick A. Bell, Jr., *Race, Racism and American Law,* 2nd Edition (1980); Mary Frances Berry, *Black Resistance/White Law,* (1971); John Hope Franklin, *From Slavery to Freedom: A History of Negro Americans,* 5th edition, Vintage Books (1980); A. Leon Higginbotham, Jr., *In The Matter Of Color: Race and the American Legal Process, The Colonial Period* (1978); Gunnar Myrdal, *An American Dilemma,*

H. Kay, *Sex-Based Discrimination* 1–2 (1981). *See also* M. Gruberg, *Women in American Politics* (1968).

The Supreme Court has noted, in a slightly different context that "[t]here can be no dispute that the financial difficulties confronting the ... woman ... exceed those facing the man" and that these difficulties have occurred from either "overdiscrimination or from the socialization process of a male dominated culture." *Kahn v. Shevin,* 416 U.S. 351, 353, 94 S.Ct. 1734, 1736, 40 L.Ed.2d 189 (1974). In *Frontiero v. Richardson,* 411 U.S. 677, 681, 684, 93 S.Ct. 1764, 1767, 1769, 36 L.Ed.2d 583 (1973), the Supreme Court stated:

> There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination. Traditionally, such discrimination was rationalized by an attitude of "romantic paternalism" which, in practical effect, put women, not on a pedestal, but in a cage.

(footnote omitted).

Despite all of the disadvantages that women have had, historically and at present, the significant disadvantages suffered by white women have been far less than those disadvantages black women, Native American women (Indians), Hispanic and other minority American women have had to endure for centuries.[8] Yet, the paradox of AFS's plan is that it perpetuates the past disparities between white and minority women and rather than helping all women it aids only white women and slams the door of equal credit opportunity in the faces of minority women.

To return to our hypothetical, AFS helps the Janes and rejects the Sarahs solely on the basis of race. We do not believe that it

*The Negro Problem in a Modern Democracy* (1944). For an analysis of the disparties regarding Native Americans, *see generally* Vine Deloria, Jr., and Clifford M. Lytle, *American Indians, American Justice* (1983); Elizabeth A. Fenn and Peter H. Wood, *Natives and Newcomers* (1983); Sarah M. Sneed, "Against Persons Differing in Color from Themselves: The American Indian in Colonial North Carolina and Georgia" (unpublished paper, Harvard Law School, 1984).

was the intention of Congress to accentuate the disparities among disadvantaged groups by helping those women who have been the *least* deprived while denying equal opportunity to those women who have been the *most* deprived.

■ In short, we find that the district court correctly held that AFS, FNAC and Edward Satell were creditors under the ECOA. AFS admits that it intended to differentiate among its credit applicants aged 18 to 21 on the basis of race, sex, and marital status, yet the social need sought to be addressed by the AFS credit programs was unrelated to those factors. Each person in the 18 to 21 age group shared the same credit disability. The district court found and we agree that the credit terms offered to minorities, married persons and males were less favorable than those credit terms offered to single white females. Thus, AFS, FNAC and Satell violated the ECOA in designing and administering credit programs which discriminated on prohibited bases such as race, sex and marital status which were not related to the social need those programs sought to address.

■ We will also affirm the district court's order enjoining certain AFS marketing and hiring practices. The scope of the order extends only to those aspects of AFS's business practices that further AFS's illegal discrimination on the basis of race, sex and marital status in the extension of credit.